**Defendant Aurora's customs, policies, and/or practices within the APD caused the violations of Dr. Parmar's constitutional rights.**

1.       APD Defendants' treatment of Elijah McClain was engaged in pursuant to Aurora's custom, policy and/or practice of unlawful conduct, including but not limited to: racially-biased policing; aggression and violence when policing Black people and people of color; using excessive force in its law enforcement practices, particularly against Black people and people of color; unlawfully detaining, arresting, or charging people, particularly Black people and people of color, in order to cover up and justify unconstitutional uses of excessive force; failing to discipline officers, or even find the officers engaged in wrongdoing, in the face of obvious constitutional violations; and failing to adequately train and supervise APD officers.

2.       Aurora has a longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying use of excessive force, particularly against Black people and people of color.  As a result, it has become customary among Aurora police officers to use unjustified and excessive force, particularly against Black people and people of color, because Aurora has communicated to APD officers that such force is authorized and, indeed, expected, and when used will be defended or covered up by the supervisory and municipal apparatus of the City.

3.       It is the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Aurora to encourage or tolerate law enforcement officers to use race and race-based animus as motivating factors in police decisions and actions, as well as to fail to supervise and train APD officers in the rights of individuals to be free from such race-based decision making in law enforcement. This custom, policy, and/or practice has led to Aurora police officers, on a regular basis, using elevated and unjustified levels of force against Black people and people of color.

4.      It is the longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of Aurora to permit law enforcement officers to use any hesitation to comply with an officer's (legal or illegal) commands—even when officer safety is not jeopardized by the hesitation—as justification to use force. In other words, Aurora police officers commonly demand immediate and complete submission, especially by Black people and people of color, to any police directive, no matter the command. Failure to utterly and immediately submit customarily triggers hostility, aggression, and violence by Aurora police officers.  This custom, policy, and/or practice has led to Aurora police officers, on a regular basis, using elevated levels of force, especially against Black people and people of color, including Elijah McClain.

5.      The APD Defendants' violation of Elijah McClain's constitutional rights, standing alone, is sufficient evidence of Aurora's herein-described customs, policies, and/or practices because all of the involved officers acted in such a similar egregious manner. The sheer number of officers involved—all of whom took active part and/or failed to intervene to prevent fellow officers' use of obviously excessive force—makes clear that their actions were caused by APD's training, customs, policies, and practices. Of particular importance, the active and observational involvement of Sergeants in the overwhelmingly excessive force and their failure to intervene to prevent or reduce the force, also proves that the concerted use of force was pursuant to and caused by APD's official and/or de facto training, customs, policies, and practices.

6.      Aurora's unconstitutional customs, policies, and practices are further demonstrated by its history of race-based discrimination and brutality as reflected in both a statistical analysis of its policing and by the many cases brought by the victims of such brutality,

and its additional misconduct and cover-up after killing Elijah McClain.

> **1. Aurora's unconstitutional customs, policies, and/or practices are demonstrated by statistics that Aurora Police are more likely to use force against Black people and people of color, even though Black people and people of color comprise a minority of the Aurora population.**

7.      APD targets Black people and people of color and subjects them to greater force as compared with other members of the Aurora community.

8.      For example, from January 2013 through December 2019, the Aurora Police Department ranked 8th out of the 100 largest cities in the United States for most police killings per capita. During that same period, APD killed Black people at 4 times the rate it killed white people.[1]

9.      Statistical analysis of APD's recent history with Black people and people of color also demonstrates the widespread, systemic nature of APD's unconstitutional pattern of using force against Black people and people of color. Statistical analyses show that a statistically significant racial disparity exists in APD's use of force against Black people compared to its rate of using force against Caucasians and its rate of using force all other races besides Black people.[2]

10.      Statistics show that APD's use of force per arrest is 1.26 times greater against Black arrestees than against arrestees of other races. APD's deadly and injurious use of force per arrest is 1.43 times greater against Black arrestees than against arrestees of other races. APD's use of Taser weapons per arrest is 1.40 times greater against Black arrestees than against arrestees of other races. APD's use of force per arrest was also higher against Black arrestees than against only Caucasian arrestees. Black people arrested by APD thus had a

_____

[1] Police Accountability Tool, https://mappingpoliceviolence.org/cities (last visited July 9, 2020).

[2] July 14, 2020, Report by Dr. Lance Kaufman of Bardwell Consulting Ltd.

disproportionately high risk of experiencing use of force compared to arrestees of all other races, as well as specifically compared to Caucasians.[3]

11.     In 2017, APD's rate of use of force per person was 5.5 times greater against Black people than people of other races.[4]

12.     Departmental data similarly showed that in 2019, almost half of the people against whom APD officers used force were Black, even though Black people only make up 16% of Aurora's population.

13.     Statistics show that Black people present no higher risk of officer injury during arrest than Caucasian arrestees, meaning that risk to officer does not explain APD's higher use of force against Black people relative to Caucasians.[5]

14.     Despite the consistently disproportionate use of force against Black people—the percentage of Black people whom APD officers have used force against has stayed between 38% and 53% of all APD uses of force since 2014—Aurora's annual use of force reports do not attempt to explain or understand the persistent disparately negative treatment of Black people over the course of many years.

> **2.  Aurora's unconstitutional customs, policies, and/or practices are demonstrated by many incidents of unconstitutional brutality by APD, especially against Black victims, and racially-biased policing by APD.**

15.     In addition, many other instances of Defendant Aurora's similar constitutional violations show that use of excessive force by APD officers, especially against Black people and other people of color, is customary and the standard operating procedure in the City of Aurora

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

Police Department, as is racially-biased policing. This pernicious, racist custom and practice persists today.

16.      For example, on August 2, 2020, APD officers detained and handcuffed Brittany Gilliam, a Black woman, and four Black children, including her six-year-old daughter, at gunpoint after supposedly mistakenly identifying Ms. Gilliam's car as a stolen motorcycle. APD officers pointed guns at the children and forced them to exit the car and lie on their stomachs; the officers handcuffed two of the children behind their backs. The officers likewise forced Ms. Gilliam to exit the car at gunpoint, handcuffing her and placing her in the back of a patrol vehicle. Video footage of the stop shows the children crying hysterically while surrounded by police officers. The use of force by the officers was clearly excessive, and obviously motivated by racial profiling.

17.      On March 1, 2020, an APD officer confronted Dr. P.J. Parmar, a person of color, when Dr. Parmar arrived at his business. As Dr. Parmar drove up to his garage, he found an APD officer parked on his property. Dr. Parmar stopped immediately and honked. At that point, the officer jumped out of his car and swore at Parmar. The officer then pulled out his gun while running toward Dr. Parmar's car. The officer pointed his gun at Dr. Parmar's head without having any reason to believe that Dr. Parmar was committing or had committed a crime, or posed any threat to the officer or anyone else. Dr. Parmar calmly and repeatedly asked the officer to leave his property, to which the officer repeatedly demanded—without any legal justification— that Dr. Parmar prove that it was his property. Instead of leaving, the officer called in two other APD officers. APD had no reasonable suspicion much less probable cause for its officers' seizure of Dr. Parmar, which was clearly motivated by racial profiling.

18.      On August 27, 2019, just days after Defendants killed Elijah McClain McClain,

APD Officer Levi Huffine arrested an unidentified Black woman for a suspected municipal code violation. Officer Huffine handcuffed the woman and left her hobbled in the back of his patrol car. At some point, the woman slipped such that she was inverted and her head was at the floor of the patrol car in a dangerous and exceedingly uncomfortable position. Though the woman begged Officer Huffine for help, telling him repeatedly that she could not breathe, that her neck was breaking, and that she didn't want to die this way, Officer Huffine ignored her pleas, leaving her in the dangerous, painful position for approximately 21 minutes. Officer Huffine did not so much as look at her as he drove.

19.     On November 21, 2018, Jamie Alberto Torres was fixing a car in his garage with friends when a neighbor complained about noises coming from the garage. APD officers came to Mr. Torres' home solely to investigate this noise complaint, and one of the officers illegally ordered Mr. Torres to exit his garage, threatening to take him to jail. Because Mr. Torres paused momentarily before complying with the illegal order, the officer grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground. Even after handcuffing Mr. Torres, the officer continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times. During this encounter, Mr. Torres repeatedly screamed in pain. To justify their illegal conduct, the APD officers charged Mr. Torres with resisting arrest and failure to obey a lawful order. A jury found that Mr. Torres was not guilty of these charges at trial. The Aurora Police Department investigated its officers' use of force against Mr. Torres but, as is customary, found no wrongdoing. A lawsuit based on this incident, claiming excessive force and racial bias, among other things, is ongoing.

20.     In November 2018, APD contacted Tevon Thomas and his companion, a Black woman, because a woman had called 911 to report that she was frightened by them sitting in

their car in her apartment building's parking lot at around 4:00 a.m. According to the 911 caller,

Mr. Thomas and his companion "did not belong there." APD officers contacted Mr. Thomas and

his friend, who provide the officers with a reasonable explanation for their presence in the

parking lot and did not give any indication that they posed any danger or threat to the officers or

anyone else. Nevertheless, APD officers forced Mr. Thomas and his friend to exit the car, with

the intention of searching the vehicle. Ultimately, a federal judge ruled that although the police

had a valid reason to contact Mr. Thomas, APD "unlawfully extended and turned [it] into an

unjustified or extended stop that had, as its motivation and intention, the search of the car and/or

Mr. Thomas." Like in Elijah McClain's case, the officers' lack of any other legitimate reason for

their prolonged seizure of Mr. Thomas raises the strong inference that Mr. Thomas's race was

the prime motivation.

21. On September 6, 2018, APD officers used excessive force when, after responding

to a car accident involving Andre Williams, a Black man. The officers beat and tased Mr.

Williams for not responding immediately to their order. Even though Mr. Williams showed no

signs of aggression or attempting to flee, and in fact was having a seizure, the officers took him

to the ground; then, after Mr. Williams had complied with an order to get on his stomach and

was surrounded by at least three APD officers, the officers punched him in the head, struck his

legs with their knees, and tased him twice. A lawsuit based on this incident, claiming excessive

force and racial bias, among other things, is ongoing.

22. On July 13, 2017, one APD officer choke-slammed Vanessa Peoples, a Black

woman, while police were performing a welfare check in her home. Several other APD officers

then piled on Ms. Peoples. What "provoked" the officers' attack was Ms. Peoples' protestations

of the officers' misconduct and her failure to be 100% compliant with every single police

directive (legal or illegal). Eventually, the officers hog-tied Ms. Peoples so tightly that they dislocated her shoulder. Despite Ms. Peoples' continued cries of pain, APD officers kept her hog-tied for 30 minutes with her shoulder dislocated. APD officers had no reason to believe Ms. Peoples had committed a crime; yet they charged her with obstruction. Those charges were later dismissed. Ms. Peoples settled her potential claims against Aurora for $100,000 pre-litigation. Aurora did not discipline any of the involved officers for their unconstitutional actions.

23.     On April 22, 2017, multiple APD officers responded to a car accident that involved Brandon Washington, a Black man. When Mr. Washington, who had hit his head on his vehicle's steering wheel during the crash, dazedly attempted to stand up out of his vehicle, the officers used excessive force by tasing him repeatedly and subjecting him to a variety of other unwarranted physical force, hospitalizing him. Aurora did not discipline any of the involved officers for their unconstitutional actions. A lawsuit based on this incident, claiming excessive force and racial bias, among other things, is ongoing.

24.     On September 14, 2016, an APD officer used unwarranted excessive force against Dennis Seabaugh while Mr. Seabaugh was detained in an Aurora jail cell. After getting frustrated with Mr. Seabaugh's repeated but ineffectual attempts to hang himself by tying a t-shirt around his neck, the officer stormed into the cell, and without providing Mr. Seabaugh reasonable warning, command, or an opportunity to comply, the officer got on top of Mr. Seabaugh and smashed his head down while simultaneously applying his body weight to pin Mr. Seabaugh down. The officer then smashed Mr. Seabaugh's face into a bench in the cell multiple times, while yanking on his arms; ultimately, the officer used so much force pulling on one of Mr. Seabaugh's arms that he broke Mr. Seabaugh's humerus bone. Aurora settled Mr. Seabaugh's excessive force lawsuit based on the incident.

25.     On August 12, 2016, two APD officers responding to a report of a Black man with a gun ordered several occupants out of a residence, including then-minor Julian Campbell, who was Black. Mr. Campbell came outside as commanded, and subsequently obeyed all orders the APD officers gave. Nonetheless, the officers grabbed him, slammed him to the ground, handcuffed him, and cited him for disobeying a lawful order. During the subsequent criminal trial of Mr. Campbell, the court granted a motion for judgment of acquittal at the end of the prosecution's case. A lawsuit based on this incident asserting, among other things, excessive force and racial bias against Aurora and the individual APD officers is ongoing.

26.     On March 16, 2016, multiple APD officers racially profiled Omar Hassan, a Black man, and ejected him from a coffee shop simply because he is a Black man who was wearing a hoodie.  The Aurora officers acted solely on the basis of Mr. Hassan's appearance; they had no reasonable grounds for suspecting that he was engaged in any criminal conduct. Aurora officers told Mr. Hassan that he had to leave the coffee shop, because Mr. Hassan's "kind of business [was] not welcome [t]here."  When he questioned the directive, one officer placed her hand on her gun, non-verbally threatening Mr. Hassan with use of deadly force. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid Mr. Hassan to settle his legal claims.

27.     On February 19, 2016, Aurora officers stopped and detained Darsean Kelley simply because he was a Black man who happened to be in the vicinity of a reported crime. He questioned the officers' orders and demanded to know whether or not he was being detained. Mr. Kelley complied with officers' orders but also asserted "I know my rights," just as one officer tased him in the back. The Aurora officers conducting the stop had no reason to believe that Mr. Kelley had committed any crime or was armed or dangerous. To cover up the illegal stop and the

unjustified tasing, Aurora charged Mr. Kelley with failure to follow a lawful order. That charge was eventually dismissed, but Aurora found no misconduct and did not discipline any of the officers involved in this unconstitutional detention and use of excessive force. Aurora paid Mr. Kelley $110,000 to settle his legal claims prelitigation.

28.     On December 22, 2015, several APD officers assaulted OyZhana Williams, a Black woman, who was simply visiting her boyfriend in the hospital. When Ms. Williams refused the officer's illegal order that she give him the keys to her car, the officer tackled Ms. Williams, choked her, slammed her head against the ground, and then stomped on her head. Aurora officers had no probable cause or reasonable suspicion to believe Ms. Williams had committed any crime. Yet, to cover up their excessive use of force, the officers charged Ms. Williams with a crime and arrested her. The charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid over $350,000 to settle Ms. Williams' claims.

29.     On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old, disabled Black man, out of his home under threat of force, despite the fact that the officers had no warrant and no legal justification to effect a warrantless arrest in the home. After Mr. Crews complied, the officers forcefully threw him to the ground because he had momentarily delayed complying with their illegal commands in order to prevent his cat from getting out of his house. To cover up their unconstitutional conduct, the Aurora officers charged Mr. Crews with resisting arrest. The judge dismissed the charge halfway through Mr. Crews' trial. Upon information and belief, Aurora did not discipline the involved officers for their unconstitutional treatment of Mr. Crews. Aurora paid Mr. Crews to settle his legal claims.

30.     On June 29, 2015, APD officers used excessive force against Jeffrey Gale, an

unarmed Black man, after a bystander called 911 to report that Mr. Gale had attempted to steal someone's wallet. The bystander reported to the 911 dispatcher that no physical force, threats, or weapon were used in the attempted theft. Mr. Gale was 49 years old, 5'7", weighed approximately 150 pounds, and suffered from gout in both ankles. After locating Mr. Gale, two APD officers handcuffed him then forced him to the ground, kicking him in the head and back. Five more APD officers joined in to hogtie Mr. Gale. After he was handcuffed, hogtied, and lying face-down on the ground, the officers tased Mr. Gale at least three times, both in the back of his ribs and the back of his head. A later medical evaluation showed Mr. Gale suffering from metabolic acidosis from the tasing. All of the officers' body cams were turned off or the tapes destroyed, with the exception of a small portion of video from one officer after Mr. Gale was hogtied. Although Mr. Gale could not be seen during most of this one recording, he could be heard crying out in pain and begging for the officers to stop. One officer responded to his cries of pain by saying, "You better shut the fuck up or this is going to get really ugly for you." Aurora settled an excessive force lawsuit brought by Mr. Gale based on this incident.

31.     On March 6, 2015, an Aurora police officer used excessive force in the unjustified shooting and killing of Naeschylus Vinzant-Carter, an unarmed Black man. Mr. Vinzant-Carter was being pursued by Aurora's SWAT team, near an elementary school, when he was confronted. One officer then opened fire, killing Mr. Vinzant-Carter. Aurora paid $2,600,000 to settle Mr. Vinzant-Carter's claims. Upon information and belief, Aurora did not discipline any of the involved officers for this use of excessive force.

32.     On September 25, 2014, an APD officer used excessive force in arresting Cory Scherbarth by using a leg sweep to drop Mr. Scherbarth to the ground despite his lack of aggression toward the officer or anyone else, but rather in response to Mr. Scherbarth's non-

threatening questioning of the officer about his intentions. After Mr. Scherbarth was handcuffed with no resistance, while he was lying on his stomach, APD officers slammed his head into the ground and punched him in the face, and one officer pressed his body weight down against Mr. Scherbarth with his knee against Mr. Scherbarth's shoulder. A lawsuit based on this incident claiming excessive force against the individual APD officers is ongoing.

33.     On July 8, 2014, APD officers used excessive force against Gaye O'Malley, a 55-year-old Black woman, after she called 911 to request medical assistance for her friend who had fallen and injured herself at home. Without justification, an APD officer took Ms. O'Malley to the ground using an "arm drag takedown," a "twist-lock," and a "prone control hold." The APD officer had a history of unusually aggressive conduct toward citizens, particularly Black people. Ms. O'Malley was handcuffed, arrested, removed her from the home, and charged with assault, battery, obstructing a police officer, resisting arrest, and obstructing municipal operations. Aurora later settled an excessive force lawsuit brought by Ms. O'Malley.

34.     On July 3, 2014, APD officers used excessive force against Adam Bentz in response to his peacefully using his cellphone to record what he perceived as APD unlawfully towing his vehicle. Despite the fact that there was absolutely no indication that Mr. Bentz posed any physical threat to APD officers or anyone else, an APD officer grabbed Mr. Bentz around his neck, applied constricting pressure, and took Mr. Bentz down to the ground—very similar to the actions Defendant Rosenblatt and Defendant Woodyard used against Elijah McClain when taking him to the ground. The APD officer maintained the hold of Mr. Bentz's neck for 80 seconds while other APD officers restrained Mr. Bentz's limbs, leading Mr. Bentz to lose consciousness and stop breathing, although he was later revived. The force used against Mr. Bentz far exceeded that necessary to arrest him. Aurora later settled a lawsuit brought by Mr.

Bentz asserting excessive force.

35.     On June 22, 2012, when APD officers were searching for three suspects described as Caucasian, they stopped Stetson Fields, a Black man, despite having no probable cause or reasonable suspicion to do so. After Mr. Fields left the encounter, the APD officers chased him until they located him behind a bush. Although Mr. Fields complied with the officers' request to come out from the bush and did not pose any threat to the officers, the officers released a police dog to attack Mr. Fields, leaving him with injuries.

36.     On July 23, 2011, an APD officer conducting an impromptu police undercover investigation shot and killed Juan Contreras, a Latino man. Mr. Contreras had found a set of lost car keys and was attempting to return them to the owner when he was wrongfully suspected of committing a minor crime, and APD shot and killed him. Aurora paid $400,000 to settle Mr. Contreras' claims.

37.     On January 14, 2011, APD officers arrested Jovan McGlothin, a Black man. During the arrest, one of the officers used a racial slur to refer to Mr. McGlothin (saying, "we have you now, [n-word]," or words to that effect). After two officers had Mr. McGlothin entirely within their control such that he posed no threat to them or anyone else, one of the officers used excessive force by kicking Mr. McGlothin in the mouth and chipping one of his teeth. Aurora settled an excessive force lawsuit based on this incident.

38.     On December 18, 2010, Aurora police officers used excessive force in their brutal treatment of Rickey Burrell, a Black man lying helpless in his bed after suffering a seizure. The officers had responded to a 911 call from Mr. Burrell's family. Rather than render assistance, Aurora officers inexplicably jumped on Mr. Burrell, wrenched his arm behind his back, and handcuffed him. The officers proceeded to roughly drag Mr. Burrell outside, though he was clad

only in underwear that he had soiled during his seizure. Mr. Burrell suffered a wrist fracture and other injuries to his back and shoulder as a result of the officers' actions. Aurora paid $100,000 to settle Mr. Burrell's claims. Aurora did not discipline any of the involved officers for their unconstitutional actions.

39.      On May 10, 2009, Aurora police used excessive force in severely beating David Walker, a Black man, after responding to a call at his house in Aurora. APD officers unlawfully entered the house without a warrant, and tased Mr. Walker at least seven times without any reason or justification to do so. APD officers further hit Mr. Walker multiple times with batons, and hit and kicked him. ADP's excessive force caused Mr. Walker to suffered nerve damage. At least one of the APD officers involved had an extensive history of excessive force allegations. Aurora settled an excessive force lawsuit based on the incident brought by Mr. Walker.

40.      On February 12, 2009, Aurora police officers used excessive force in effecting the arrest of Carla Meza, a Latina woman. Aurora officers responded to a domestic violence report after Ms. Meza was accused of assaulting her girlfriend. Officers handcuffed Ms. Meza and proceeded to make homophobic remarks towards her before one of the officers kicked her in the head while she was handcuffed, breaking her eye socket. The officer kicked her in the head because she refused to comply with his unlawful commands. Surprisingly, even Aurora conceded that the officer used excessive force.

41.      In June 2006, an APD officer choked, slapped, and slammed to the ground twelve-year-old Cassidy Tate, a Black girl. The officer had accused the girl's mother of illegally parking in a handicapped spot, despite the fact that Ms. Tate's mother had a handicap placard and used portable oxygen. In contacting Ms. Tate and her mother, the Aurora officer stated, "can you believe these fucking N's," which was a clear reference to the "n-word." Ms. Tate's claims

settled for $175,000. Not only did Aurora not discipline the officer, it later promoted him. Later, the same officer who brutalized Ms. Tate was caught on body camera footage referring to Black people as "Alabama Porch Monkeys."  The officer was later terminated by APD, but the City of Aurora reinstated him.

42.     In December 2003, APD officers shot and killed Jamaal Bonner, a young Black man, during a prostitution sting. When an Aurora SWAT team burst into his hotel room, Mr. Bonner, who was unarmed, stood up in surprise. Aurora officers tased him, causing him to go the ground face down. Though Mr. Bonner had already been effectively tased, was surrounded by Aurora police officers, and was not armed, an Aurora officer shot Mr. Bonner three times, killing him. Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid $610,000 to settle the family's legal claims.

     **3.**  **Aurora's unconstitutional customs, policies and/or practices are demonstrated by APD's continuing misconduct and cover up after killing Elijah McClain.**

          *a.*  *Aurora's approval of Defendants' conduct is reflected in its failure to discipline any of the APD Defendants for their role in killing Elijah McClain*

43.     Consistent with APD's longstanding pattern in response to officers who use excessive force against Black people, APD did not impose ***any*** discipline against any of the APD Defendants for killing Elijah McClain.

44.     On February 6, 2020, APD released a statement that the APD Defendants were within APD policy and followed APD training in their actions toward Elijah McClain.

45.     APD specifically confirmed that a Force Review Board had determined that the force applied to Elijah McClain was within policy and consistent with training.

46.     APD's public statement and failure to discipline any of the APD Defendants

makes clear that their conduct was carried out pursuant to the customs, policies, practices, and training of APD, and that such conduct is customary within APD.

> **b. *Elijah McClain Defendants Dittrich and Marrero, along with APD Officer Jaron Jones, took photographs at the site where Defendants killed Elijah McClain, reenacting the chokehold that contributed to his death, and sending them to Defendants Rosenblatt and Woodyard as a "joke."***

47.     On June 30, 2020—shortly after news of Aurora's murder of Elijah McClain McClain gained international prominence—APD Interim Chief Vanessa Wilson announced that multiple APD officers were the subjects of a completed internal affairs investigation that had revealed that many months earlier, those officers had returned to the scene of Elijah McClain's killing to take photographs of themselves re-enacting elements of that use of force. The photos included mimicry of the carotid chokeholds employed by Defendants Rosenblatt and Woodyard.

48.     The three smiling officers depicted in the photos were Defendant Kyle Dittrich, Defendant Erica Marrero, and APD Officer Jaron Jones.

49.     The actions of Defendants Dittrich and Marrero, along with APD Officer Jaron Jones, in creating and distributing smiling photos of themselves reenacting the chokehold that killed Elijah McClain at the site of his killing by APD officers, demonstrate that rank-and-file APD officers operate under the assumption that racist behavior will be tolerated or approved of by their colleagues.

50.     The APD officers who participated in the offensive photoshoot, which emulated the American racist tradition of white citizens taking photos of themselves at the scenes of lynchings, felt so comfortable in doing so that they took the photos in their APD uniforms.

51.     Indeed, the officers were so unafraid of professional consequence for their racist mockery of Elijah McClain's death that they freely distributed their photos to other APD

officers—again, emulating the tradition of white, racist American citizens who turned their photographs of themselves at lynchings into so-called "lynching postcards" to be mailed to friends and family.

52.     Defendant Dittrich described the decision to take the photos and to select the mocking poses struck by the APD officers as follows: "We had uh Officer Jaron Jones who just came back to team 30 after he was on a suspension, um and I just wanted to show Officer Woodyard that we were together, um, in solidarity thinking of him. So, I thought it would be funny if we took a photo there, and uh the three of us took a photo at the scene. It was just a quick, you know one photo, um, we had Officer Jaron Jones put his arm around my head kind of in a half buddy-buddy but also sort of **as homage to the carotid control hold.**" (Emphasis added.)

53.     Defendant Dittrich sent the photos that he had taken with Defendant Marrero and Officer Jones to a text message group that included at least Defendant Woodyard, Defendant Rosenblatt, Defendant Marrero, Officer Jones, himself, and one other APD officer.

54.     Defendant Dittrich stated that his purpose in sending the photos to Defendants Woodyard and Rosenblatt was to "cheer them up."

55.     Defendant Dittrich further noted that one of his purposes in taking the photos was to cheer up Officer Jones, who had just returned from a lengthy suspension for drinking and driving.[6]

---

[6] APD's and its officers' loyalty to protect one another from accountability for misconduct is illustrated by their March 2019 treatment of APD Officer Nate Meier, who was found passed out drunk behind the wheel of his patrol car while on duty. APD did not conduct a criminal DUI investigation of Officer Meier despite the obvious criminality of his actions. APD has continued this de facto policy of not conducting criminal investigations of officers who drink and drive. In December 2019, APD Officer Annette Brook drove herself to work, where an APD sergeant who contacted her believed she showed "signs consistent with the consumption of alcoholic beverages." A portable breath test demonstrated that she had a blood alcohol content at .138,

56.     Defendant Rosenblatt evidently was cheered by the photos, and replied to the text message group, "HaHa."

57.     Defendants Dittrich, Marrero, and Rosenblatt were ultimately terminated from APD as a result of their actions with regard to the photo. Officer Jones resigned from APD prior to the imposition of discipline.

58.     Defendants Woodyard and Rosenblatt both failed report the racist photoshoot to their APD superiors upon receiving the photos, demonstrating that APD officers do, in fact, protect their colleagues who take racist actions on duty and in uniform. However, Aurora did not discipline Defendant Woodyard for his failure to do so.

59.     Defendants Dittrich, Rosenblatt, and Marrero were never disciplined for their actions (and inactions) on the night of August 24, 2019, that caused Elijah McClain McClain's death, evincing Defendant Aurora's preoccupation with harm to the reputation of its police force rather than the physical harm that its officers, including APD Defendants, cause to the Aurora community.

### c. *Elijah McClain Defendant Aurora falsely, publicly claimed to have hired an "independent" investigator to examine the use of force against Elijah McClain.*

60.     On June 9, 2020, three members of Aurora City Council's public safety committee—Allison Hiltz, Curtis Gardner, and Angela Lawson—issued a statement calling on Aurora City Manager Jim Twombly to order an independent, neutral, third-party review of Elijah McClain's killing.

61.     In response to the statement, Mr. Twombly claimed that the City had already hired an "independent investigator," Eric Daigle.

---

well beyond the threshold for a DUI charge, but APD initiated only an internal affairs investigation, and did not collect evidence for a DUI investigation.

62.     Despite Defendant Aurora's assurances that Elijah McClain's parents would be advised and kept abreast of any investigation conducted into Elijah McClain's death, Defendant Aurora *never* advised Elijah McClain's parents or their counsel of Mr. Daigle's hiring or activities.

63.     Mr. Daigle is a police officer, and his firm's website announces that he has devoted a substantial portion of his career as an attorney to representing, counseling, and advising law enforcement personnel.

64.     The website further boasts, "Defending municipalities, police chiefs, and individual officers from law enforcement liability claims is, and has been, a significant portion of the experience that Attorney Daigle brings to our clients."

65.     Indeed, rather than hiring a truly independent investigator to examine the death of Elijah McClain McClain and to determine what failures within APD led to such a tragic outcome, it appears that Defendant Aurora actually hired a municipal defense attorney to prepare a legal defense for itself and the APD Defendants, while publicly claiming that it had complied with City Council's request for an independent, neutral, third-party review.

66.     Mr. Twombly's decision to mislead the public and city councilors about Mr. Daigle's role, and to claim that an independent investigation was underway when in fact such was only for litigation defense, is emblematic of Defendant Aurora's efforts to simply *appear* to investigate and address the APD Defendants' egregious actions, rather than to *actually* investigate and take accountability for those actions.

67.     After this breach of trust was publicly revealed and the three council members who initially requested an independent, neutral, third-party review of Elijah McClain's death expressed their dissatisfaction with Mr. Twombly's cynical hiring of Mr. Daigle, Aurora officials

announced that the City's contract with Mr. Daigle would be terminated.

68.     Under significant public scrutiny, a new investigator has now been announced.

### d. Defendant Aurora actively and violently suppressed public protests calling for justice for Elijah McClain McClain.

69.     On June 27, 2020, thousands of protesters gathered at the Aurora Municipal Center—which houses APD headquarters—to protest Elijah McClain's killing by APD and AFR personnel and to celebrate Elijah McClain's life with a peaceful violin vigil.

70.     In a bizarre display of force, dozens of APD officers clad in riot armor and openly displaying weapons appeared at the peaceful protest.

71.     Though the protesters posed no threat to the APD officers, the officers began using force against protesters, including the use of batons, pepper spray, and smoke grenades. Video shows terrified protesters fleeing from the onslaught of heavily-armored APD officers, even as a group of violinists peacefully played an improvised melody in Elijah McClain's honor.

72.     The plain intent of Defendant Aurora's use of excessive force to suppress constitutionally-guaranteed protest of its police practices was to chill the protected speech of the protestors present and the protected speech of any future protester. Any citizen who chooses to protest the Aurora government's actions knows that they face the risk of force at the hands of a ruthless APD.

### 4. Defendant Aurora is liable for the APD Defendant's violations of Dr. Parmar's rights.

73.     Defendant Aurora's unlawful conduct, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

74.     Through Defendant Aurora's continuous ratification of unlawful arrests,

excessive force, and biased decision making against people of color, particularly Black people, Defendant Aurora caused the APD Defendants' illegal conduct.

75.     Given APD's long history and widespread practice of APD officers using excessive force against people, particularly Black people and people of color, and/or taking racially-biased actions against Black people, Aurora knew or had constructive knowledge that its officers used excessive and unnecessary force and/or would be influenced by racial bias when contacting Black People and people of color, and that such bias could cause the APD officers to utilize excessive and unnecessary force against Black people like Dr. Parmar.

76.     In light of this knowledge, Defendant Aurora could have and should have pursued reasonable methods for training and supervising APD officers, including the APD Defendant, in interacting with Black people and people of color and the appropriate use of force, but it failed to do so.

77.     Moreover, APD persistently failed to meaningfully investigate and discipline numerous APD officers for their similar uses of excessive force, especially those against Black people. Aurora's failure to find officer wrongdoing and failure to discipline officers in this case and in the cases described above and others reflects a custom, policy, and/or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regimen of training provided by Aurora, and that such conduct is customary within APD.

78.     APD's deliberate and conscious failure to correct prior constitutional violations based on similar conduct constituted an affirmative choice to ratify the conduct, and to send a clear message to its law enforcement officers that such misconduct is acceptable and approved. It

is Aurora's responsibility to properly train its officers to ensure they perform their duties correctly and to discipline, rather than ratify and encourage, their improper conduct, so that officers can learn from their mistakes and the mistakes of their colleagues and be deterred from engaging in misconduct that violates the constitutional rights of people with whom the police interact. Aurora's failure to do so has clearly communicated to APD Defendants that excessive force, especially against Black people, as well as racially-biased policing, is authorized and tacitly (or explicitly) encouraged.

79.     Aurora's past ratification and toleration of similar illegal conduct thus caused and was the moving force behind the APD Defendants' use of excessive force against Dr. Parmar, and Aurora's failure to discipline the APD Defendant for this illegal use of force will predictably lead to more unconstitutional conduct in the future.

80.     Accordingly, Defendant Aurora knew or had constructive knowledge of the need to provide additional or better training and supervision in and the areas of use of force and avoiding racially-biased policing and made a deliberate choice to not adequately train and supervise APD officers in avoiding excessive force and racially-biased policing.

81.     Aurora knew or should have known that its acts or omissions in this regard were substantially certain to cause APD officers to violate individuals' constitutional rights, like Elijah McClain's and Dr. Parmar's, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to its policy and custom of excessive force, especially against Black people and people of color, and/or racially-biased policing, and of failing to provide additional or better training and supervision to APD officers in these areas.

82.     Defendant Aurora was deliberately indifferent to Plaintiffs' constitutional rights, because Aurora knew or had constructive knowledge that individuals in Dr. Parmar's position

would be at a substantial risk of suffering dangerous consequences from Aurora's customs, patterns, practices and/or failure to properly train and supervise its employees.

83.     Defendant Aurora could have and should have pursued reasonable methods for the training and supervising of such employees, or disciplining them if they engaged in misconduct, but intentionally chose not to do so.

84.     Defendant Aurora fostered "a policy of inaction" in the face of knowledge that APD officers were routinely violating specific constitutional rights, which constitutes the functional equivalent of a decision by Aurora itself to violate the Constitution.

85.     Because Defendant Aurora created and tolerated a custom of deliberate indifference and has continuously failed, despite the obvious need to do so, to adequately train and supervise APD officers in use of force and avoiding racially-biased policing, individuals in Aurora, especially Black people and people of color, including Dr. Parmar, have repeatedly been subjected to violations of their constitutional rights.

86.     Defendant Aurora's policy of failing to act in the face of a long history of excessive force against people, particularly Black people and people of color, and its custom, policy, and practice in failing to properly train and supervise its employees despite such history and knowledge or constructive knowledge of such history, were the moving force and proximate cause of Defendants' violation of Plaintiffs' constitutional rights.

87.     Defendant Aurora's custom, policy, and practice of encouraging, condoning, tolerating, and ratifying racially-biased policing and excessive force, as described herein, and the subsequent cover-ups of such constitutional violations, were the moving force behind, and proximate cause of, Defendants' violation of Plaintiff's constitutional rights.

88.     Defendant Aurora's acts or omissions caused Plaintiff's significant damages.

89.     Defendant Aurora's actions, as described herein, deprived Plaintiffs of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.